LEROY ELSEMORE *vs.* INHABITANTS OF THE TOWN OF HANCOCK.

Hancock.      Opinion, March 4, 1941.

*Charles J. Hurley,* for plaintiff.
*Blaisdell & Blaisdell,* for defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, WORSTER, MURCHIE, JJ.

MURCHIE, J.    The defendant brings this case before the court on exceptions to the ruling of a justice of the Superior Court accepting the report of a referee awarding damages of $775 to the plaintiff.

Hearing was held under a rule of reference which reserved the right of exceptions to both parties as to questions of law, and the case is properly before the court under that reservation.

The action is case to recover damages for breach of a contract under which the plaintiff alleges that he was employed to teach the high school in the defendant town during the school year 1939-1940. The alleged contract is an oral one made between the superintendent of schools and the plaintiff on the basis of authorization claimed to have been voted at a meeting of the superintending school committee held May 3, 1939. Defendant relies on the fact that said meeting was not legally convened because of the lack of proper notice to all members of the school board and that it was conducted in the absence of a member who in fact received no *actual* notice prior to the time for which the meeting was called. No question is raised but that if defendant is answerable in damages, the amount of the award is a proper one.

The referee found, as a matter of law, that the meeting in question was not a legal meeting and, as a matter of fact, that, subsequent to the employment, the action of the superintendent of schools in engaging the services of the plaintiff for the ensuing school year had been ratified by the school board; that "there was an actual approval of the nomination of the plaintiff as teacher by the school board"; and that "a valid contract was entered into and that there was a breach of that contract."

Defendant's objections to the acceptance of the report of the referee and the exceptions to the decree of acceptance challenge the findings that there was a valid contract between the parties and a breach thereof on the part of defendant on grounds which, variously phrased in nine (9) stated objections, are founded on two basic theories; first, that ratification of a contract for teaching in a town school on the part of a member of a school board not bound by the action of a committee meeting, prior at least to such time as performance might have begun, or partial payments have been made, or benefits have been accepted by the town, must be express, or evidenced by definite acts of recognition or acquiescence; and second, that assuming a valid contract to have been entered into between the parties, subsequent action of the town abolishing the high school operated as an automatic revocation thereof, and, to refer to the

argument of counsel rather than to the formal language of the exceptions, that any contract to teach in a free high school must be presumed to be entered into by a teacher subject to an implied understanding that a vote of the electors legally convened in town meeting abolishing the school will terminate it without liability on the part of the town. Since the latter principle can be of importance only if there was a valid subsisting contract between the town and the plaintiff prior to the town meeting of July 24, 1939, it seems advisable first to determine that question.

The record clearly discloses that the superintendent of schools attempted to convene a meeting of the school board in the defendant town on May 3, 1939; that prior to the time of the meeting, or attempted meeting, notice was *actually given* to two members of the school board and *left verbally* at the home of the third who was out of town; that this notice did not in fact reach that member; that he did not return home until after the meeting; that he did not attend the meeting; that he learned of the meeting the day following; and that for a period of more than two months thereafter, he made no effort to determine the purpose for which the meeting had been called or what business had been transacted at it. Whether or not, willy-nilly, he was a party to conversations about the purpose of the meeting and the business transacted thereat, with the superintendent of schools and one of his associates, is a matter of conflict in the testimony, as will hereafter be noted.

The record further discloses that at said "meeting" the superintendent of schools, in accordance with his statutory duty (R. S. 1930, Chap. 19, Sec. 70e), recommended to the school board the employment of the plaintiff and three other teachers. The record is silent as to whether or not these additional teachers were employed, as was the plaintiff, in reliance on the approval given by the two members of the school board who were present at the meeting, but the school year by universal custom commences in September annually and carries through to the following June, and there is no question raised but that all the teachers approved, or intended to be approved, by committee action at the meeting of May 3rd were employed for the ensuing school year and rendered service during that year in accordance with contracts entered into on the basis of authorization similar to that of the plaintiff's. That the schools in

the defendant town did operate on the basis of contracts based on such approval may reasonably be inferred from the fact that the record discloses no appointment of substitute teachers pursuant to the provisions of Chapter 19 above referred to which, as amended by Chapter 9 of the Public Laws of 1935, authorizes the appointment of such substitutes by the commissioner of education in case of failure of the superintendent of schools and the superintending school committee "to legally elect a teacher."

The ruling of the referee that there was no legal meeting of the school board on May 3rd necessarily carries the inference that a meeting of a school board in this state cannot be legally convened except by notice which in fact reaches each and every member thereof, and negatives the right to convene a meeting by notice left at the usual place of abode of a committee member. It is of course essential that there be some definite requirement of notice for meetings of school boards, since such a board is a deliberative body, every member of which is entitled to be present at every meeting to counsel and advise on any and every action which the committee is required or authorized by law to take, but a requirement that no meeting of a school board may be legally convened until and unless notice thereof is given to each member personally would be a serious handicap in the operation of our schools and would inevitably throw a heavy burden on the commissioner of education under the 1935 law above noted. It is unnecessary in this case that there be either ratification or repudiation of that ruling since there are ample facts in the record to justify the finding of fact made by the referee that the action of the superintendent of schools in employing this plaintiff on the basis of the approval voted at the "meeting" of May 3rd was ratified. Mr. Eugene Chamberlain, the school board member whose absence from the meeting lays the foundation for defendant's claim, was at the time serving his second year as a member of that board. He testified that he learned of the meeting on May 4th when his wife told him that another member of the board had called at the house and "said they were going to have a meeting"; that he made no effort to see the superintendent of schools or either of his colleagues on the board thereafter; that he did not see the superintendent of schools from that date until the twenty-fourth day of July following; that he never talked over the employment of any teachers; that when he

learned of the employment of the plaintiff, or of his "reelection" at the meeting of May 3rd, he "neither objected or approved" and, explaining his answer "Possibly" to an inquiry as to whether he had any objection, he stated,

> "As a matter of fact, I had been notified there was to be a special town meeting to discontinue the school and that put a different light on the whole thing."

The record discloses a clear conflict of testimony between the statements of Mr. Chamberlain, on the one hand, and those of another member of the school board, Mr. Brenton, and the superintendent of schools, on the other, as to discussions of school matters between May 4, 1939 and July 24, 1939. The finding of the referee carries the necessary inference that his decision of fact is based on his rejection of the testimony of Mr. Chamberlain in this regard and his acceptance of the testimony of the other parties, and the testimony of those other parties, if believed, fully justifies a finding of facts that constitute legal ratification.

Defendant claims that notwithstanding the contract on which plaintiff relies was entered into between the parties (if the fact shall so be determined), that contract was terminated, without liability on the part of the town, by the vote to abolish the free high school which plaintiff, under the contract, was to teach. The case contains a stipulation, entered by agreement of counsel, which reads

> "It is agreed that there was a special town meeting held in the town of Hancock, July 24th, 1939. One of the articles in the warrant, to wit article 4, was 'to see if the town will vote to discontinue the High School and to transfer the unexpended balances to the secondary tuition account.' On that article it was 'Voted to discontinue the High School, and Voted unexpended balances be transferred to the secondary tuition account.'"

Under this stipulation counsel for defendant argues, as heretofore noted, that any contract to teach in the high school must be presumed to have been entered into subject to an implied understanding that the contract might be abrogated, without liability on the part of the town, by the action so taken.

That there is a principle of law which recognizes implied understandings of this nature, and the effect of happenings beyond the control of the contracting parties which render performance of contract obligations impossible, is beyond question. Illustrations are available in public service law, where the State in the exercise of its sovereign power imposes regulations, non-existent at the time of the making of a contract, which in the exercise of its police power, compel modification in a contract price or terms; and in personal service contracts, or contracts dealing with particular properties, where either the death or incapacity of the individual, or the destruction of the property, renders performance impossible without default on the part of either contracting party.

The sovereignty rule has been recognized in this state in *In Re Guilford Water Co.*, 118 Me., 367 at 372, 108 A., 446, 449, where the court said,

> "The rule is general, that every contract touching matters within the police power, must be held to have been entered into with the distinct understanding that the continuing supremacy of the State, if exerted for the common good and welfare, can modify the contract when and as the benefit of that interest properly may require."

This case, which contains a review of the authorities on this aspect of public service law, clearly sets forth the necessity for the rule of a distinct or implied understanding in all contracts having to do with services in this particular field.

That the same principle is applicable to contracts involving personal services was recognized by this court in *Dickey* v. *Linscott*, 20 Me., 453, where a laborer, undertaking to work for a period of months, covering principally the season when farming was impossible, was incapacitated by illness for the major part of that period. There the court declared,

> "But in a contract for the performance of personal manual labor, requiring health and strength, we think it must be understood to be subject to the implied condition, that health and strength remain. If by the act of God, one half or three fourths of the strength of the contracting party is taken away, per-

formance to the extent of his remaining ability, would be hardly thought to entitle him to the compensation for which he may have stipulated, while an able bodied man. There may be cases where the hazard of health is assumed by the employer. This might be regulated by known and settled usage. Generally, however, the right to wages depends upon the actual performance of labor. On the other hand it is not expected, that the laboring party should be subjected to any other loss, where his inability arises from the visitation of Providence."

The limits of the principle, that a breach of contract may result from a direct and sole cause for which neither party is responsible so that a right of action to recover damages does not arise from the breach, within which principle the implied understanding rule clearly falls, were aptly phrased by the Utah Court in *McKay* v. *Barnett*, 21 Utah, 239, 60 P., 1100, 1102, reported and annotated in 50 L. R. A., 371. There the court said,

> "Where the contract is to do acts which can be performed, nothing but the act of God or of a public enemy or the interdiction of the law as a direct and sole cause of the failure will excuse the performance. This principle is elementary."

The facts in that case involved a teaching contract, which had been interrupted by a school closing, ordered because of the prevalence of contagious disease. The court, noting that the school board might in its contract "have stipulated that the plaintiff should have no compensation during the time the school should be closed" on any such account, held that, not having done so, it could not deny compensation during the closed period.

In *Abrams* v. *Board of Education*, 230 Ky., 151, 18 S. W., 2d, 1000, 1001, a school closing which resulted from destruction of the building by fire was under consideration, and the court, holding the teacher entitled to recover compensation, declared,

> "The destruction of a building by fire is not a vis major, but is a character of misfortune that may be anticipated, and one that could have been provided for in this contract, if the parties had intended for the teacher's salary to cease upon the school being suspended thereby. In the absence of such stipulation, the

failure of the board to furnish another house . . . constituted a breach of contract."

Annotations carrying the citation of numerous authorities in cases where teaching contracts were interrupted or terminated by school closings on account of disease, or by the destruction of buildings by fire, are to be found in the annotation of *McKay* v. *Barnett*, supra, and in 6 A. L. R., 744. The cited cases show the general rule to fall within the limits stated in the above quotation from that case.

The contract here in question is one to which the defendant town became a party, through the action of that authority duly constituted by law to engage its teachers. Just as the contract came into existence by action of an agent of the town, so the defendant claims that termination resulted, and without liability, by the action of another town agency, the town meeting.

The instant case does not fall within the principle of implied understandings heretofore discussed. No *vis major* is involved. There is no suggestion of a stipulated limitation that the contract, which was verbal, should be ineffective if the voters of the town should elect to discontinue the school. To hold that the sovereignty rule, which avoids a contract made either between individuals or corporations, or between an individual or corporation and a municipality, by the sovereign exercise of police power, is applicable to the present facts would be a great extension of the rule for which no precedent has been called to our attention. Assuming authority to be vested in the voters of a town to discontinue a free high school at will, where no contract rights are involved, we do not believe it should be permitted, as one of the parties to a valid contract, to avoid its contractual obligations by such roundabout action.

Defendant offers no authority to support its claim that a town may abolish its high school, notwithstanding a contract to teach therein, except such inference as flows from the use of the word "may" in Section 91 of Chapter 19 of the Revised Statutes of 1930, used in connection with the authorization for towns to raise money to maintain free high schools, as against the word "shall," used in Section 16 of the same chapter, which imposes the requirement that towns raise and expend money for the support of common schools. It seems unnecessary to determine in the present case whether or not

the supervision and management of free high schools, vested in the superintending school committee by the provisions of Section 90 of Chapter 19, give that committee the same control as to discontinuance of free high schools, or changes in their location, which is applicable to schools generally under Section 2 of said chapter. For the purposes of the present case, it is enough to say that the Town of Hancock, which became party to a contract for teaching in its free high school, did not terminate its liability under that contract by vote at town meeting to abolish the school, and the entry must be

*Exceptions overruled.*